UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DONALD WHITE, I | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:11-cv-00224-NT |
| | ) | |
| BARBARA SWARTZ, et al., | ) | |
| | ) | |
|     Defendants | ) | |

**RECOMMENDED DECISION AND ORDER**

Donald White[1] is an inmate at the Maine State Prison currently serving a sentence after being convicted of robbery and kidnapping. White was transferred from the Maine Correction Center (MCC) to the Maine State Prison (MSP) on September 21, 2011, well after this suit was filed. White is suing a number of MCC state correctional officers as well as three counselors affiliated with a sex offender program named RULE[2] operated at that correctional facility. White's theory is that these defendants violated his constitutional rights to due process.[3] Both sets of defendants, the state correctional officials and the private contract employees, have filed motions to dismiss. (Doc. Nos. 29 & 30.) On September 19, 2011, White filed a motion for a temporary restraining order and/or preliminary injunction requiring the defendants to obtain an independent psychological examination of White and to develop and implement a plan of

---

[1]     This is one of two suits that White has pending in this Court.
[2]     I refer to the program with all caps and no periods, although the parties vary in their citations. RULE is an acronym for "Responsibility, Understanding, Learning, and Experience."
[3]     In his complaint and his second amended complaint White does not mention an Eighth Amendment claim. (2d Am. Compl. at 6.) In his November 30, 2011, memorandum in support of his amended complaint he does introduce this theory. (Doc. No. 65 at 1.) He asserts that in earlier pleadings he has described the crowding in the D-2 area of the RULE program. (Id. at 9.) In his second amended complaint he also describes what he considers to be overcrowding in the dorms, White sleeping in a small dorm with four inmates per room in D-1. (2d Am. Compl. at 15.) He figures that these sleeping quarters surely provide less than 40 square feet per person. (Id.)
    White also mentions the First Amendment but he does not directly tie this theory of recovery to his claims under the RFRA cum RLUIPA.

treatment designed by a "qualified professional/specialist not contracted/employed by" the Maine Department of Corrections (MDOC). (Doc. No. 26 at 7.) On November 15, 2011, White filed a second motion for a temporary restraining order that addresses his demands that he be transferred from the Maine State Prison back to MCC because he has enemy issues at the former. (Doc. No. 55.)[4] White also wishes to amend his complaint to add as defendants Counseling and Psychotherapy Centers, Inc. (CPC), the employer of the private contractors, and Robin Eagan, White's caseworker in 2010 when he was placed in the RULE sex offender program. (Doc. No. 39.) White's proposed amended complaint is thirty-two pages long and elaborates in greater detail the history of his discontent with the classification and placement decisions surrounding his participation in the MCC-based sex offender program.

This recommended decision addresses all the pending motions that are ready for review. I now recommend that the court grant both motions to dismiss, deny, as futile, the motion to amend, and deny the first motion for injunctive relief because the complaint fails to state a claim for which relief can be granted and White is no longer at MCC so these defendants are not susceptible to a restraining or injunctive order vis-à-vis White. As for the second motion for injunctive relief, White has voluntarily withdrawn the motion (Doc. Nos. 63 & 64).

*Discussion*

**Complaint Allegations**

In his complaint White describes his criminal history including a 2002 guilty plea conviction to a sex offense. In 2003 he violated his probation and served eighteen months. In 2009 he pled guilty to robbery and kidnapping charges and received a sentence of eight years, all but four suspended, and three years of probation.

---

[4] On November 18, 2011, both movants filed motions to stay discovery until the resolution of the motions to dismiss. The stay dispute is addressed below.

He was incarcerated at MCC. He describes himself as having been settled in and ready to serve his time but while he was going about his daily activities an inmate that knew White from his 2003 incarceration was following his 2009 case in the papers. This inmate, John Poulin, took it upon himself to discuss White with Defendant Hannah Monaco, a RULE counselor. He describes these two as going on a crusade to change White's life. White alleges that Monaco broke confidentiality by discussing White's life with this inmate. Prior to his incarceration Monaco was White's counselor for a time.

White relates that when he saw Poulin in the chow hall Poulin stated that he had talked to Monaco and that they were going to get White into the sexual offender program called RULE. White insists that he never signed any release of information form that would allow Monaco to discuss his business with others.

A few months later a correctional officer came to White's cell and told him to pack his bags because he was moving to Dorm 1 for the program. White demanded that he be taken to the Sergeant and Sergeant Coffin took him to his office and spoke to White for forty-five minutes about the need to turn his life around. White was in tears. He faults Monaco for sabotaging his life by forcing him into the RULE program, even though he was not then serving time for a sex offense.

Then Unit Manager Penny Bailey entered into the office with her input and made things worse. Bailey had never spoken more than two words with White before and now she was all of a sudden an advocate for his change.[5] After a while White agreed to go into the program

---

[5] According to the pending amended complaint Bailey announced to those present that Monaco told her that White had done very well in counseling before. This counseling according to White was on the heels of his sex offense. (Proposed Am. Compl. at 13-14.) He feels that this disclosure first to Bailey and then to Sergeant Coffin violated his rights. He states that he also had groups with Gordon Winchell prior to moving to Monaco's group during that time. (Id. at 14-15.)

3

because he did not want to go into segregation and lose all his privileges which would have been the consequences of his refusal. He was upset and embarrassed and felt abused.

He did an intake with Monaco and Defendant Gordon Winchell and was probed with questions and tests. He passed a lie detector test. Despite his allegations that he was made to go through a comprehensive intake session, White complains that there was never a proper 'assessment' done to demonstrate he should be in the RULE program.[6] (See also Doc. No. 65 at 6, 9.) He insists that he was not a sexual predator or a deviant but realizes now that that did not matter. He was forced to stay.

While in the program, White was harassed by other inmates and made to listen to their stories of their acts of sexual abuse that made White sick to his stomach. He became depressed and had suicidal thoughts. He was exposed to raw trauma, sexual predators and their fetishes. Now he sees people differently and he has all these thoughts running around in his head—fantasies playing all the time. He describes this as terrible. White's harassment included people whispering things about him that were not true whereas before entering Dorm 1 and the RULE program he had not been so harassed. He has been picked on and threatened and had to even pay for his protection at one juncture.

At one point White got written up for a disciplinary infraction following a February 13, 2011, visit with his daughter. According to the proposed amended complaint during this visit another one of the RULE participants was eyeing White's daughter and smirking sinisterly at White. White informed the presiding corrections officer that he was not going back to his dorm and the other inmate looked at White in a goading or threatening manner.[7] The attendant

---

[6] I believe that White is referring to Maine Department of Corrections Policy 26-19 to support his claim that he should have been "assessed." (See Doc. No. 26-19.)

[7] (Proposed Am. Compl. at 24-25.)

disciplinary decision for not returning to his dorm resulted in White being put in administrative segregation. (Doc. No. 26-25 at 10.)[8]

White describes himself as having lost everything when he went to segregation. He received sanctions, was given no furloughs, no work release, no paying job, and was not able to access fenceless space. Rather, he is stuck in segregation with idle time. His several grievances have been denied. He wrote to Defendants Jeffery Merrill and Scott Burnheimer and they have utterly ignored him.

White explains that at that time the only two things he needed help with were the referral of the appeal to Jeff Merrill weeks earlier and the fact that two days earlier Jacobson had said he would look into education for White. The only mention of Erick Munson was one made by White when he returned home from the D-1-2 meet. White told his dorm officer that he had to see Munson ASAP because he was near psychosis or insanity. That night White did not sleep well until 4 A.M. because it was all running through his head. White adds that no one at the meeting made reference to mental health in his presence.

On May 18, 2011, White was called down to Dorm 1 where he was met by Penny Bailey, Kenny Fearon, Donald Jacobson, and the Inmate Poulin who initially discussed White with Monaco. Poulin had reported that White had been harassing him; he was making false statements, trying to get White in trouble and brought to Dorm 1. While the defendants describe this as an informal mediation between Poulin and White, White complains that he never consented to a mediation. (Mot Inj. Relief at 96, Doc 26.)

Attached to White's complaint are two documents entitled "Incident." His first addresses interactions, apparently also on May, 18, 2011, with Defendant Donald Jacobson. (Doc. No. 1-

---

[8] Apparently White was terminated from RULE on March 2, 2011, with sanctions. (Doc. No. 1-7.)

11.) White states that he went to an office to request assistance with obtaining his MCC prisoner account information and upon leaving he encountered Jacobson in the office doorway. Jacobson said, "Hello Mr. White" and White replied, "Hello." Jacobson inquired how White was and White replied, "good, and you?" Jacobson replied that he was good and then stated, "Did you see Erick [Munson, a mental health counselor]. I went right over to him so you would see him right away." He continued, "I told you I would work with you." White avoided any more conversation and proceeded to his cell.

On May, 23, 2011, White was leaving the chow hall and was just outside the entrance when he entered into a conversation with Defendant Kenny Fearon. (Doc. No. 1-12.) White asked if Fearon had a moment. White asked him if John Poulin was going to be held accountable for manipulating staff and making false statements. Fearon responded that he would be held accountable if he saw Poulin doing so. White asked, "What was that the other day then?" Fearon replied that it was not Poulin but it was others; however, Fearon would not clarify who the others were. When White questioned why Poulin was there, Fearon walked away. It is White's contention that Poulin surely should not have been in that room on May 18, 2011.

White attaches many pages to his complaint. I have reviewed these materials although most of these submissions are not considered part of the complaint for purposes of ruling on the motions to dismiss. They do assist the Court in understanding the nature of White's claims.

**The Motions to Dismiss**

**Motion to dismiss standard**

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint can be dismissed for "failure to state a claim upon which relief can be granted." To decide a motion advanced on this basis, the Court accepts as true the factual allegations of the complaint, draws all reasonable

inferences in favor of White that can be supported by the factual allegations, and determines whether the complaint, so read, sets forth a plausible basis for recovery. Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008). The touchstones of my analysis of this motion to dismiss are Ashcroft v. Iqbal, 556 U.S. 662 (2009) and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). The First Circuit summarized in Decotiis v. Whittemore: "The Federal Rules of Civil Procedure require a complaint to set forth 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" 635 F.3d 22, 29 (1st Cir. 2011) (quoting Fed. R. Civ. P. 8(a)(2)). The First Circuit reflected in Peñalbert–Rosa v. Fortuño–Burset, that "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." 631 F.3d 592, 595 (1st Cir.2011).

When the plaintiff is a pro se litigant, the Court will review his or her complaint subject to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). Additionally, the pleadings of pro se plaintiffs are generally interpreted in light of supplemental submissions, such as any response to a motion to dismiss. Wall v. Dion, 257 F. Supp. 2d 316, 318 (D. Me. 2003). In some circumstances, if it appears that a pro se litigant might be able to plead adequate facts if he or she better understood the applicable law, the Court may provide some opportunity to understand what the law requires, along with an opportunity to supplement the pleadings, all in order to avoid a scenario in which a pro se plaintiff's claims are summarily dismissed with prejudice based on a failure to plead sufficient facts. Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 20 (1st Cir. 2004); Cote v. Maloney, 152 Fed. Appx. 6, 8 (1st Cir. 2005) (unpublished).

7

**Dismissal arguments**

Defendants Scott Burnheimer, Jeffrey Merrill, Penny Bailey, Donald Jacobson, Kenny Fearon, and Christopher Coffin (the correctional defendants) move to dismiss White's complaint for failure to state a claim upon which relief can be granted. They argue that the sanctions imposed on White for refusing to participate in the sex offender program do not implicate any constitutionally protected right; that White was afforded due process; and that White's remedy, if any, for denial of his grievance was through the prison's administrative process and the state judicial system.

Defendants Barbara Schwartz, Hannah Monaco, and Gordon Winchell (the medical defendants) also move for summary judgment for failure to state a claim. They join the correctional defendants' motion but also argue that there are no cognizable claims in White's complaint and attachments that set out sufficient facts as to Schwartz and Winchell. As for Monaco, they recognize that there are more factual allegations against her but insist that White has still failed to state a plausible claim that she violated White's constitutional rights.

**Motion to dismiss analysis**

The keystone with respect to both motions to dismiss is the question of whether or not White has a due process claim related to the MCC's decision to place him in the RULE program. The correctional defendants joined by the three defendants contracted to do services at MCC argue that there is simply no due process right in the prison setting to challenge placement in a certain program or particular housing assignment.

As the United States Supreme Court previously noted in <u>Sandin v. Conner</u>, prisoners can press a Due Process Clause claim only if the complained of practice "imposes atypical and

significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995). It opined:

> Admittedly, prisoners do not shed all constitutional rights at the prison gate, Wolff [v. McDonnell], 418 U.S. [539,] 555 [(1074)] but " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " Jones [v. N.C. Prisoner's Labor Union], 433 U.S. [119,] 125 [(1977)] quoting Price v. Johnston, 334 U.S. 266, 285 (1948). Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law.

515 U.S. at 485.[9]

With regards to the decision to place White in RULE, defendants rely heavily on McKune v. Lile, 536 U.S. 24 (2002) which involved a challenge to a mandatory sex offender program in prison. McKune covered both the placement in the sex offender program and the negative classification ramifications of refusing that placement. Although the claim was framed as a Fifth Amendment challenge premised on a theory of self-incrimination, the Court drew significantly on Sandin. 536 U.S. at 37-38. The majority determined in McKune that there was no liberty interest in a prison setting as "inmates must expect significant restrictions, inherent in prison life, on rights and privileges free citizens take for granted." Id. at 40. It summarized:

> The limitation on prisoners' privileges and rights also follows from the need to grant necessary authority and capacity to federal and state officials to administer the prisons. See, e.g., Turner v. Safley, 482 U.S. 78(1987). "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Id., at 84-85. To respect these imperatives, courts must exercise restraint in supervising the minutiae of prison life. Ibid. Where, as here, a state penal system is involved, federal courts have "additional reason to accord deference to the appropriate prison authorities." Ibid.

---

[9] The Court held that "Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." Id. at 486 (emphasis added).

9

Id. at 37.

Drawing on the resolution of the due process challenge in Hewitt v. Helms, 459 U.S. 460 (1983) McKune explained:

> Respondent also complains that he will be demoted from Level III to Level I status as a result of his decision not to participate. This demotion means the loss of his personal television; less access to prison organizations and the gym area; a reduction in certain pay opportunities and canteen privileges; and restricted visitation rights. An essential tool of prison administration, however, is the authority to offer inmates various incentives to behave. The Constitution accords prison officials wide latitude to bestow or revoke these perquisites as they see fit. Accordingly, Hewitt v. Helms, 459 U.S. 460, 467, n. 4 (1983), held that an inmate's transfer to another facility did not in itself implicate a liberty interest, even though that transfer resulted in the loss of "access to vocational, educational, recreational, and rehabilitative programs."

Id. at 39 (record citations omitted).

Prison administration is not the only theme in these seminal cases. The prison's role in rehabilitation also enjoys a spotlight. In conclusion the McKune Court remarked apropos the sex offender program: "The State's interest in rehabilitation is undeniable." Id. at 48.[10] Earlier, the court noted: "Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism." Id. at 33 (citations omitted). "An important component of those rehabilitation programs require participants to confront their pasts and accept responsibility for their conduct." Id. (citation omitted). See also, e.g., O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 351 (1987); Pell v. Procunier, 417 U.S. 817, 823 (1974). Even if the program requires disclosure of prior uncharged sexual offenses, opening the way for further prosecution (which White has not alleged here), the McKune Majority concluded that it passed constitutional scrutiny. For "participants to accept

---

[10] White is not claiming that he was forced to incriminate himself while in the RULE program. He argues primarily that he was not then incarcerated on a sexual offense, had already completed a treatment program on his earlier sexual offense, and that he was made to listen to other program participants' descriptions of their conduct which was traumatic for him.

full responsibility for their past actions, they must accept the proposition that those actions carry consequences." McKune, 536 U.S. at 34 (record citation omitted).

I conclude that, following the above precedents, White fails to state a Due Process Clause claim against any of the named defendants for his placement in RULE and his subsequent classification change and loss of privileges when he refused further participation. As for the question of whether he was properly 'assessed' for entry into the program, White has not made a convincing argument that the intake interview, lie detector test and all, was not an 'assessment' as envisioned under the MDOC policy.

As for the May 18, 2011, allegations, White puts most of the blame on Inmate Poulin for having him called down to Dorm 1 by way of false statements that led to what the correctional defendants describe as a mediation. There are no allegations that this meeting led to any disciplinary action against White as a consequence of this inter-inmate dispute. (See Doc. No. 26-26.) Similarly, White's encounter with Donald Jacobson with regards to Eric Munson had no unconstitutional consequence. There was a discussion between the two and White avoided any more conversation and went to his cell.

Finally, there was similarly no consequence to the May 23, 2011, conversation that White initiated with Kenny Fearon about Poulin's accountability for manipulating the staff and making false statements. Fearon had no obligation to share his views with White and there is no way he can be held liable under 42 U.S.C. § 1983 for this interaction.

**Administrative Exhaustion**

The other concern for White apropos his due process claim challenging the decision to remove him from the RULE program and place him in administrative segregation is that he did not appeal his classification through the proper state channels. See Fleming v. Commissioner,

11

Dept. of Corr., 2002 ME 74, ¶ 8, 795 A. 2d 692, 694 (review of prison administrator's decision available under Maine Administrative Procedures Act and Maine Rule of Civil Procedure 80C). In his November 22, 2011, 'reply' memorandum, White argues that he only needed to satisfy the exhaustion requirements of the Prison Litigation Reform Act. (Nov. 22, 2011, Mem. at 5 -7.) He states: "I did my best to exhaust what remedy if any was offered to me by MCC staff…." (Id. at 4; see also id. at 5.) He insists that "any other remedies the defendants may lay claim I did not exhaust were not made known to me by any staff I reached out to concerning the matter – and if any remedy exists presently I can utilize I have no knowledge of it – I would have and will exhaust any means necessary regarding my plight." (Id. at 7.)

It was not MCC staff that was required to inform White of the state remedies for appealing his classification decision. In my view it is unnecessary to delve further into this procedural defense because of my conclusion that the complaint fails to state a claim against the defendants.

**Religious Freedom Restoration Act and Religious Land Use and Institutionalized Person's Act**

With regards to the initial complaint there is no mention of a claim under the Religious Freedom Restoration Act (RFRA) or the Religious Land Use and Institutionalized Person's Act (RLUIPA). In an attachment to that complaint White states: "Unethical conduct by RULE staff/MCC staff/CPC staff. Transference/counter transference in regards to staff instructions to 'hold victims/other victims to/up to the light! I ask what light'." (Doc. No. 1-13 at 2, ¶ 5.)

In his most recent memorandum responding to his motions to dismiss White asserts in a conclusory manner that the "RULE programming and instruction by staff that also violated the Plaintiff's First Amendment rights, under RLUIPA .…" (Nov. 22. 2011, Mem. at 3; see also

Doc. No. 65 at 10.)[11] In his proposed amended complaint White has three paragraphs relating to this claim. (Proposed Am. Compl. at 22.)

White alleges that the RULE counselors facilitating the groups often act by "holding victims up 'to the light'—the healing light' in [the] day room, holding said victims to some light after abuser talks to an empty chair as if they were showing their 'empathy'." (Id. ¶ 56.) Although this practice is allowed in the dayroom White is denied a chance to discuss his religion by the RULE staff. (Id. ¶ 57.) During morning meditations White cannot bring his bible but yet others can bring rosaries, medicine pouches, and such. (Id. ¶ 58.) While others are allowed to practice their religion, spirituality and transcendental meditation, White is not allowed to practice his religion. (Id. ¶ 59.) He was forced to participate out of his fears and the fragility of psyche

---

[11] White first introduces this claim in his proposed amended complaint and maintained that it was cognizable as a Religious Freedom Restoration Act claim. As the United States Supreme Court explained last term in Sossamon v. Texas:

> RLUIPA is Congress' second attempt to accord heightened statutory protection to religious exercise in the wake of this Court's decision in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990). Congress first enacted the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb et seq., with which it intended to "restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) ... in all cases where free exercise of religion is substantially burdened." § 2000bb(b)(1). See generally Gonzales v. O Centro Espírita Beneficente União do Vegetal, 546 U.S. 418, 424 (2006). We held RFRA unconstitutional as applied to state and local governments because it exceeded Congress' power under § 5 of the Fourteenth Amendment. See City of Boerne v. Flores, 521 U.S. 507 (1997).
> Congress responded by enacting RLUIPA pursuant to its Spending Clause and Commerce Clause authority. RLUIPA borrows important elements from RFRA—which continues to apply to the Federal Government—but RLUIPA is less sweeping in scope. See Cutter v. Wilkinson, 544 U.S. 709, 715 (2005). It targets two areas of state and local action: land-use regulation, 42 U.S.C. § 2000cc (RLUIPA § 2), and restrictions on the religious exercise of institutionalized persons, § 2000cc–1 (RLUIPA § 3).
> Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise" of an institutionalized person unless, as in RFRA, the government demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. § 2000cc–1(a); cf. §§ 2000bb–1(a), (b). As relevant here, § 3 applies "in any case" in which "the substantial burden is imposed in a program or activity that receives Federal financial assistance." § 2000cc–1(b)(1).
> RLUIPA also includes an express private cause of action that is taken from RFRA: "A person may assert a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." § 2000cc–2(a); cf. § 2000bb–1(c). For purposes of this provision, "government" includes, inter alia, States, counties, municipalities, their instrumentalities and officers, and persons acting under color of state law. § 2000cc–5(4)(A).

563 U.S. __, ___131 S.Ct. 1651, 1655 -56 (2011) (footnote omitted).

and a sense of coercion. (Id. ¶ 60.) White further alleges that he is a Christian and none of his personal beliefs involve holding persons up to a 'light,' 'healing light' as he was required to do as part of the RULE program and he had to witness and be in a small room packed with others practicing all kinds of spiritualties and various religions. (Id. ¶ 121.) White has believed in God, the Holy Spirit and Jesus since childhood. (Id. ¶ 122.) He has written his children allegorical stories of God, love, faith, hope and joy as characters. Happiness, Humble, and Patience were his children in the story published in the spring 2010 Doing Time newsletter under his initials. This was written prior to the threat or thought of the RULE program. He has written much more of his faith based literature, poetry, stories, and etcetera. (Id. ¶ 123.)[12]

Attached to White's first motion for injunctive relief is a one-page document entitled "RFRA." (Doc. No. 26-4.) It reads:

> My spiritual beliefs/religion … I am Christian. I believe in God the father, God the son and the holy spirit – I pray, I read scripture and pray over it. I have a decent understanding of scripture →The holding of any persons to a[] "light" has never been part of my beliefs – nor has sitting in a[] room 45 minutes plus idol → Staff can project their beliefs in facilitation of program in day room (anniversary "light" yet I can[] not openly discuss my beliefs in day room? I am at a[] loss for words over all I witnessed in RULE program ….*lay witnessing/fear, coercion, force etc. *my freedom of expression violated.

(Id.)

Section 3 of RLUIPA provides: "No government shall impose a substantial burden on the religious exercise" of an institutionalized person unless the defendant demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. 42 U.S.C. § 2000cc–1(a). The allegations set forth above do not sufficiently support a claim that the defendants imposed a substantial burden on White's religious exercise. See, e.g., Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007) ("For the

---

[12] In responding to the motion to amend neither set of defendants address this aspect of White's amendment.

14

purposes of RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs."); Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir. 2004)('[T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs. On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.") (emphasis added). Assessing this claim even though White did not plead this cause of action in his complaint, I fail to see how witnessing others or being asked to hold a person up to 'light,' 'healing light' puts substantial pressure on White to modify his behavior and violate his Christian beliefs. Peñalbert–Rosa, 631 F.3d at 595 ("[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." ). White's description of his fear and coercion are not supported by factual allegations of how he was coerced into not practicing his religion on a day-to-day basis; he confines his allegations to times when the group is meeting. There are no allegations that RULE staff limited White in reading his bible and discussing his religion when outside the group setting.

**State Law Counts**

To the extent that White is pressing state tort claims against the defendants, I recommend that the Court decline to exercise supplemental jurisdiction and dismiss these claims without prejudice. See 28 U.S.C. 1367(c); Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir.1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit ... will trigger the dismissal without prejudice of any supplemental state-law claims."); accord Gonzalez-De-Blasini v. Family Dept., 377 F.3d 81, 89 (1st Cir.2004). I note that with regards to White's claim against Monaco and her disclosure of his prior counseling to others, he has pled this as a state law claim. On December 5, 2011, White filed a memorandum asserting that he believes that his claims are actionable under the Maine Human Rights Act. (Doc. No. 67.) Under the circumstances of this case this is the sort of state law claim that should also be dismissed without prejudice.

**The Motion to Amend**

On August 16, 2011, I entered the following order on White's first motion to amend:

> This submission is not in the proper form for an amended complaint, which must be submitted as an entire document. Plaintiff must provide the address for the defendants who are not state employees and I am not sure if the Needham, Mass. address given in this document is intended to be the defendants' address for purposes of service. It is also unclear who the additional defendants are and what allegations pertain to them. It is plaintiff's responsibility to submit a proposed amended complaint with his motion that sets forth ALL defendants, including the original defendants, and explains why he is suing is named defendant. It is not a matter of simply adding names.

(Doc. No. 14.) Not until after these dispositive motions were filed did White file a second motion to amend on October 4, 2011. (Doc. No. 39.) He explains that he wants to add Counseling and Psychotherapy Centers Inc. and its employee Robyn Eagan as defendants. (Id. at 1-2.) The amended complaint as it relates to the originally named defendants for the most part

rehashes the allegations of his initial complaint and attachments. I have made reference to it in setting out the facts above.

On November 30, 2011, White filed a memorandum of law in support of his amended complaint. (See Doc. No. 65.) In this filing White writes at some length on why his amended complaint survives the Prison Litigation Reform Act's (PLRA) physical injury requirement. White is referring to 42 U.S.C. § 1997e(e) that provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." He argues that even absent physical injury he can still receive nominal and punitive damages. He further asserts that he describes physical ailments in his complaint resulting from mental, emotional, and psychological issues that greatly impacted him throughout his ordeal. In particular, he has pled that he was sick to his stomach, his hair was thinning, he suffered sleeplessness, and was shaking.[13] The defendants have not (yet) argued that § 1997e(e) is a bar to damages for the alleged constitutional violations.

I now deny the second motion to amend as futile. I have addressed the amended complaint's allegation under RLUIPA and determined that there is no sustainable cause of action based on White's allegations. With respect to the desire to add two new medical defendants the allegations are insufficient to distinguish their conduct from the other medical defendants.

---

[13] White also refers to two assaults at the MSP that occurred after he was transferred from MCC. He attributes this to a mention of his placement in Dorm 1. The defendants in this action cannot be held accountable for that alleged physical injury.
In a similar vein, with his November 30, 2011, filings White has attached documents that pertain to his grievances and requests at the MSP. (See Doc. Nos. 66-2, 66-3, 66-4, 66-5.) These documents are not relevant to White's claims against the defendants named in this action.

**The motion for injunctive relief**

White's first request for a temporary restraining order fills 101 pages including attachments. (Doc. No. 26.) He seeks the Court's prospective order requiring that he receive proper and effective psychiatric care. He again complains that he was subjected to RULE sex offender treatment at MCC and the RULE staff there. He states that since he withdrew from RULE he feels like MCC staff has treated him unfairly as if he was doing something wrong for refusing RULE, fighting sanctions, and filing this law suit. He wants the defendants to provide him with mental health professionals that are not under contract with the Maine Department of Corrections and seeks a court order that the defendants carry out the plan of action coming from the independent professional. Much of his attached writings are redundant of his claims of past alleged wrongs set forth above that I have already addressed in the context of the motions to dismiss.

Per White's own subsequent pleadings he is no longer in the custody of MCC. (Doc. No. 55.) See Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (transfer to a different unit moots claim for injunctive relief for conditions in the former unit); Inmates v. Owens, 561 F.2d 560, 562 (4th Cir. 1977). The prospective relief requested no longer can be ordered against the named defendants.

**Objections to the motions to stay discovery**

Finally I note that on November 30, 2011, the court received an opposition to the medical defendants' motion to stay discovery (Doc. No. 59) and the correctional defendants' joining of that motion (Doc. No. 60). The deadline for their response to the discovery requests was approaching. Pursuant to Federal Rule of Civil Procedure 6(b)(1)(A), I entered the following order on November 18, 2011, in response to the motions filed that same day:

> defendants' responses to the outstanding discovery requests are stayed until 30
> days following this court's final decision on the pending motions to dismiss;
> additionally any further discovery initiatives are likewise stayed. Following
> resolution of the motions to dismiss, if the matter remains on the docket I will
> issue a scheduling order which will allow sufficient time for full discovery in this
> case. No party will be prejudiced by this relatively brief stay of discovery and
> both the plaintiff and the defendants will be spared unnecessary costs and/or
> efforts.

(Docket No. 61.) White signed his objection on November 21, 2011, and it was docketed on November 30, 2011 (Doc. No. 66). It was technically timely as objections were due December 9, 2011. However, my November 18, 2011, order stands.

## Conclusion

Based upon the foregoing, I now recommend that the Court grant both motions to dismiss and deny the motion for temporary restraining order. (Doc. Nos. 29, 30 & 26.) I deny the motion to amend the complaint as well. (Doc. No. 39.)

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 6, 2011